2006014015.001         BK 18419 1225         05/02/2006 06:37:58

DMZ Cover Sheet 2.0                                    Page 1 of 1

# Fairfax County Land Records
## Cover Sheet



**Instruments**
COVENANT MODIFICATION

**Grantor(s)**
RESTON ASSOCIATION_I_N ,  RESTON HOME OWNERS ASSOCIATION_I_N ,  RESTON
HOMEOWNERS ASSOCIATION_I_N , ...

**Grantee(s)**
RESTON ASSOCIATION_I_N ,  RESTON HOME OWNERS ASSOCIATION_I_N ,  RESTON
HOMEOWNERS ASSOCIATION_I_N , ...

| Consideration | | Consideration % | 100 | |
|---|---|---|---|---|
| Tax Exemption | | Amount Not Taxed | | |
| DEM Number | | Tax Map Number | | |
| Original Book | 6072 | Original Page | 69 | |
| Title Company | | | Title Case | |
| Property Descr. | RESTON ASSOCIATION | | | |
| Certified | No | Copies | 0 | Page Range |



```
Print Cover Sheet
```

Return to: Chadwick Washington Moriarty Elmore & Bunn
9990 Fairfax Blvd, ste 200
Fairfax, VA 22030

# The First Amendment to the Deed of Amendment to the Deeds of Dedication of Reston

THIS FIRST AMENDMENT TO THE DEED OF AMENDMENT TO THE DEEDS OF DEDICATION OF RESTON IS made this _____ day of April, 2006 by Reston Association, formerly known as RESTON HOME OWNERS ASSOCIATION trading as Reston Association, and amends, in part, and restates herein, the Deed of Amendment to the Deeds of Dedication of RESTON, recorded among the land records of Fairfax County, Virginia, in Deed Book 6072 at page 69, et seq., and further modifies and amends those certain Deeds of Dedication of RESTON, Sections One and Two, recorded among the land records of Fairfax County, Virginia, in Deed Book 2431, at page 319, et seq., and Deed Book 2499, at page 339, et seq., respectively, and amended in Deed Book 2750 at page 130 and in Deed Book 2761 at page 415, respectively, and further amended as to both deeds in Deed Book 5947 at page 1127 (all such deeds and amendments being collectively referred to as "the Deeds of Dedication").

WITNESSETH:

WHEREAS, the Deed of Amendment to the Deeds of Dedication of Reston, sets forth certain protective covenants and restrictions affecting all real property in Reston; and

WHEREAS, the Owners and Directors of Reston Association desire to effect certain changes to the aforesaid protective covenants and restrictions contained in the Deed of Amendment to the Deeds of Dedication of Reston recorded in the land records of Fairfax County in Deed Book 6072 at page 69; and

WHEREAS, the Deed of Amendment to the Deeds of Dedication of Reston provided for its amendment and established a process for effecting such amendments pursuant to Article VIII, Section VIII.2;

NOW THEREFORE, in consideration of the premises and in accordance with the said process established in the Deed of Amendment to the Deeds of Dedication of Reston, the duly authorized Officers of Reston Association do hereby set forth the duly adopted amendments to the Deed of Amendment to the Deeds of Dedication of Reston in its entirety:

## Article I Definitions and Interpretation

**Section I.1. Definitions.** Words having initial capital letters in the provisions of this Deed shall be defined as follows:

(a) **Affected Party** shall mean and refer to any owner of Property subject to this Deed, including but not limited to the Board of Directors, or Cluster, or Condominium, or their agents who register with the Design Review Board (the "DRB") and who is materially impacted by the use or design of another Property owner.

(b) **Apartment Unit** shall mean and refer to a rental residential unit in a Multifamily Dwelling, including such units as may be used for administrative purposes. An Apartment Unit shall come into existence for Assessment purposes when the related occupancy permit is first issued for the unit by Fairfax County, and its status as such shall not be affected by subsequent vacancies.

(c) **Articles of Incorporation** shall mean and refer to the Articles of Incorporation of Reston Association.

(d) **Assessment** shall mean and refer to the lienable charges against Lots authorized by the Deed in Articles V and VII.

(e) **Association** shall mean and refer to the Reston Association, as more fully described in Article III of this Deed, and any successor thereto.

(f) **Basis** shall mean and refer to the method or formula used by the Board for determining the annual Assessment applicable to each Lot.

(g) **Board of Directors** shall mean and refer to the group of persons vested with the governance of the Reston Association, pursuant to Deed Section III.5 and Article V of the Bylaws, and Director means a member of the Board of Directors.

(h) **Bylaws** shall mean and refer to the Bylaws of the Association.

(i) **Capital Asset** shall mean and refer to Common Area or property components that have a useful life of more than three years, including but not limited to swimming pools, tennis courts, community buildings, lakes, pathways, parking areas, multipurpose courts, ballfields, tot lots, vehicles, and other equipment owned by the Association.

(j) **Capital Reserves** shall mean and refer to funding designated for future major repairs, replacements, or improvements to Capital Assets.

(k) **Cluster** shall mean and refer to a group of two or more Lots, designated as a "Cluster" on a recorded subdivision plat of the Property, or designated by, a deed of dedication, or declaration of the Property, and complying with any applicable requirements of the Fairfax County Zoning Ordinance and this Deed, and as described in Article VII of this Deed.

(l) **Cluster Association** shall mean and refer to the nonstock, membership corporation of which the Owner of each Lot within a Cluster is automatically a member.

(m) **Cluster Common Area** shall mean and refer to all real property and improvements thereon owned or leased by a Cluster Association for the common use and enjoyment of Owners in the Cluster.

(n) **Common Area** shall mean and refer to all real property and improvements thereon owned or leased by the Association for the common use and enjoyment of the Members, as described in Article IV of this Deed.



(o) **Common Expense** shall mean and refer to all expenditures made or incurred by or on behalf of the Association, together with all funds assessed for the creation and maintenance of reserves pursuant to the provisions of the Reston Documents. Except when the context clearly requires otherwise, any reference to Common Expenses includes Limited Common Expenses.

(p) **Condominium** shall mean and refer to real property in which each Unit Owner has an undivided interest in the Common Elements appertaining to that Unit and has been lawfully submitted to the Virginia Condominium Act, Virginia Code, Title 55, Chapter 4.2 as may be amended.

(q) **Condominium Unit** shall mean and refer to a portion of a Condominium designed and intended for individual ownership and use.

(r) **Deed** shall mean and refer to this First Amendment to Deed of Amendment to the Deeds of Dedication of Reston.

(s) **Design Guidelines** shall mean and refer to the policy guidelines for the external construction and alteration of the Property as developed by the DRB and adopted by the Board of Directors, as described in Section VI.1 of this Deed, or as developed by a Cluster Association, subject to review and approval by the DRB.

(t) **Employment Cost Index** shall mean and refer to the Employment Cost Index, Civilian Workers, Compensation, 12-Month Percent Change, Not Seasonally Adjusted (ECU10001A), published by the U.S. Department of Labor, Bureau of Labor Statistics, or successor equivalent measure.

(u) **Good Standing** shall mean and refer to any Member who is not more than sixty days delinquent in meeting any financial obligations to the Association or whose Lot is not otherwise in violation of the Reston Documents.

(v) **Limited Common Area** means a portion of the Common Area which has been designated by the Association pursuant to Deed Section IV.6 for the exclusive use of Owners of one or more but less than all of the Lots.

(w) **Limited Common Expenses** shall mean and refer to Common Expenses benefiting one or more but less than all of the Owners and assessed against the Lots benefited pursuant to Deed Section V.5(a)(2).

(x) **Lot(s)** shall mean and refer to: (1) any plot or parcel of land shown upon any recorded subdivision plat of the Property, with the exception of the Common Area, Cluster Common Area, and parcels designated for public or commercial use; (2) any residential Condominium Unit created under the Virginia Condominium Act, or any predecessor or successor statute; (3) any residential unit within a cooperative housing organization created under the Virginia Real Estate Cooperative Act or any predecessor or successor statute; and (4) any other residential unit, except Apartment Units.

---

(y) **Members** shall mean and refer to all Members of the Association, as defined in Deed Section III.3.

(z) **Multifamily Dwelling** shall mean and refer to a building or group of buildings, each of which consists of two or more Apartment Units, constructed on the same Lot or contiguous Lots, and containing an aggregate of at least twenty-five Apartment Units.

(aa) **Nonstock Corporation Act** shall mean and refer to the Virginia Code, Title 13.1, Chapter 10 as may be amended.

(bb) **Notice** shall mean and refer to: (1) notice published at least once a week for two consecutive weeks in a newspaper having general circulation in Reston, or (2) written Notice delivered or mailed to the last known address of the Member. In the absence of a known name or address, the Notice may be addressed to "Owner" or "Occupant" at the Lot or Apartment Unit, and the fact that the Owner may not reside therein shall not invalidate such Notice. In lieu of providing the Notice required by subsection (2), the Association may provide Notice by electronic means, subject to rules established by the Board of Directors.

(cc) **Occupant(s)** shall mean and refer to persons who reside in a residential unit within the Property and may include the Owner or lessee and members of their households.

(dd) **Officer** shall mean and refer to any individual holding an office of authority in the Association with such titles and duties as shall be stated in the Bylaws or by resolution of the Board of Directors.

(ee) **Owner(s)** shall mean and refer to the record holder(s) of the fee simple title to, or life estate in, any Lot, or to holder(s) of a share in a residential unit within a cooperative, whether one or more persons or entities, and shall include contract sellers, but exclude contract purchasers and those having such interest merely as security for the performance of an obligation.

(ff) **Percentage Cap** shall mean and refer to a limitation on certain Assessments as defined in Deed Section V.8.

(gg) **Percentage Change** shall mean and refer to the percentage change in the Employment Cost Index between the current year and the most recently published Index available thirty days prior to the beginning of the next fiscal year.

(hh) **Property** shall mean and refer to all real property, together with such other real property as may from time to time be subjected to this Deed under the provisions of Article II.

(ii) **Property Owners' Association Act** hereinafter "POAA" shall mean and refer to the Virginia Code, Title 55, Chapter 26, as may be amended.

(jj) **Reserved Common Area** means a portion of the Common Area for which the Board of Directors has granted a revocable license pursuant to Deed Section IV.5 for the exclusive use of Owners of one or more but less than all of the Lots.

4

(kk) **Reston Documents** shall mean and refer to this Deed and to the Articles of Incorporation and Bylaws of the Association, each as may be duly amended from time to time.

(ll) **Reston Master Plan** shall mean and refer to the Reston Master Plan approved by Fairfax County, as may be amended by the County from time to time.

(mm) **Rules and Regulations** shall mean and refer to the rules and regulations governing the use, occupancy, operation, Upkeep, and physical appearance of the Common Area adopted from time to time by the Board of Directors.

(nn) **Supplementary Declaration** shall mean and refer to any declaration: (1) submitting real estate to the terms of this Deed and subjecting such real estate to the jurisdiction of the Association, whether or not such Supplementary Declaration contains additional provisions reflecting the unique characteristics of the real estate being submitted; or (2) submitting a portion of the Property to such supplementary covenants in accordance with the provisions of Article II of this Deed.

(oo) **Upkeep** shall mean and refer to inspection, maintenance, repair, repainting, remodeling, restoration, improvement, renovation, alteration, replacement, and reconstruction.

(pp) **Use and Maintenance Standards** shall mean and refer to the standards governing the Upkeep, use, occupancy, condition, and physical appearance of the Property adopted from time to time by the Board of Directors and administered by the Covenants Committee.

**Section I.2. Interpretation.**

(a) Whenever a "majority vote" or "two-thirds vote" is specified, it shall mean a majority or two thirds vote, by voting power, of those persons actually voting on a matter, and that, unless otherwise provided by the Reston Documents or law, at least ten percent of the eligible votes are cast on such matter.

(b) Unless the context requires otherwise, the singular shall include the plural and vice versa and the use of one gender shall include all genders.

(c) The use of the term "including" shall mean "including, without limitation".

## Article II Property Subject to This Deed

**Section II.1. Existing Property.** The real property which shall be subject to this Deed includes any real property which, as of the effective date hereof, is either subject to any Deed of Dedication of Reston recorded in the land records of Fairfax County, Virginia, included the Deed of Amendment to the Deeds of Dedication of Reston recorded in Deed Book 6072 at page 69, as amended, or subject to a deed which incorporates by reference the protective covenants and restrictions of such Deeds of Dedication, or any additions pursuant to Deed Section II.2.

5

**Section II.2. Additions to Existing Property.** With the written consent of the fee simple Owner (if not the Association) and any holder of a deed of trust on such real estate, and a two-thirds vote of the Board of Directors during a meeting in which a quorum is present, the Association may submit any real estate to the provisions of this Deed and the jurisdiction of the Association, in accordance with the conditions and procedures set forth as follows:

(a) **Conditions for Expansion.**

(1) Before any additional real estate is submitted to this Deed and subjected to the jurisdiction of the Association, the Board of Directors must give Notice, pursuant to Deed Section I.1(bb)(1), to the Members and conduct a hearing on the matter.

(2) The Board of Directors may propose a different Assessment for Lots on the real estate being added based on the level of services and benefits available to or anticipated to be utilized by the Members on such Lots.

(3) The Board of Directors may provide for the application of different Design Guidelines and Use and Maintenance Standards for the real estate being added.

(b) **Procedure for Expansion.** The Association may record one or more Supplementary Declarations. Each Supplementary Declaration adding real estate shall:

(1) include a legally sufficient description of the real estate added;

(2) designate such real estate with a unique identifier so as to differentiate between each portion of the Property;

(3) describe any real estate being conveyed to the Association as Common Area and describe any new Lots; and

(4) comply with the requirements of the Fairfax County Zoning Ordinance and by filing of record one or more deeds with respect to the additional real property which incorporates this Deed by reference.

Any Supplementary Declaration may contain such additional covenants and restrictions as may be necessary to reflect the different characteristics of the Lots or the land uses, if consistent with the overall scheme of this Deed. The Association may not subject a Lot to a Supplementary Declaration after conveyance of such Lot to an Owner without the prior written consent of such Owner of such Lot. Upon recording a Supplementary Declaration submitting real estate to the Deed, the provisions of the Deed shall apply to the real estate thereby added as if such real estate were originally part of the Property. Any Owner submitting real estate to the Deed shall be deemed to have granted all the easements and rights granted and reserved herein to the Association and the Members.



## Article III The Reston Association

**Section III.1. The Association.** The Association is a nonstock, membership corporation organized and existing under the laws of the Commonwealth of Virginia, charged with the duties and vested with the powers prescribed by law and set forth in the Reston Documents.

**Section III.2. Purposes of the Association.** The purposes of the Association are:

(a) to interpret, administer, and enforce the protective covenants and restrictions of this Deed in such a manner as to conserve, protect, and enhance the value of all real property subject to the Deed;

(b) for the benefit of the Members, to acquire, own, sell, mortgage, convey, encumber, and lease property, real or personal, and to improve, administer, and maintain such property in neat and good order; provided, however, that the recreational facilities of the Association and other Common Area shall be intended for the use and benefit, primarily, of the Members, provided further, however, that the Board and the Association may allow the use of the recreational facilities by non-Members pursuant to Section IV.2.(d);

(c) to assess, collect, and disburse the Assessments and charges authorized by this Deed;

(d) to promote the peace, health, comfort, safety, and general welfare of the Members;

(e) to do any and all lawful things and acts that it, in its discretion, may deem to be for the benefit of the Property and the Owners and inhabitants thereof; and

(f) to exercise the powers now or hereafter conferred by law on Virginia nonstock corporations as may be necessary or desirable to accomplish the purposes set forth above.

**Section III.3. Membership.**

(a) **Members.**

(1) Category A. Category A Members shall include all Owners of Lots except Lots owned by Category B Members.

(2) Category B. Category B Members shall include all Owners of Lots on which a Multifamily Dwelling is constructed. Category B membership shall terminate forever and be converted to Category A membership when the aggregate number of Apartment Units represents less than five percent of the total number of Lots and Apartment Units on the Property.

(3) Category C. Category C Members shall be all Occupants of residential units on the Property.

(b) **Member Rights.**

---

(1) Pursuant to the provisions in Deed Section III.4, eligible Members shall have the right to vote for Directors, amendments to the Reston Documents, and other such matters as may be provided for in the Reston Documents.

(2) Except for employees of the Association, any Member in Good Standing who is otherwise eligible, pursuant to Deed Section III.4(c)(6) and Bylaws Section V.1(d), may serve as an elected Director.

(3) Any Member in Good Standing may serve as an Officer of the Association.

(4) Subject to the provisions of Deed Sections IV.2, IV.5, and IV.6, Members in Good Standing and their guests have the right of access to and the use of the Common Area.

(5) The Board of Directors shall provide a designated period of time during a meeting to allow Members an opportunity to comment on any matter relating to the Association. During a meeting at which the agenda is limited to specific topics or at a Special Meeting, the Board of Directors may limit the comments of Members to the topics listed on the meeting agenda.

(6) Members may examine the books and records of the Association according to the procedures set forth in the POAA, as may be amended. Books and records kept by or on behalf of the Association may be withheld from inspection and copying to the extent permitted by the POAA, as may be amended. In addition, individual referendum ballots and ballots for the election of Directors may be withheld from inspection and copying.

(7) The Board of Directors shall establish a reasonable, effective, and free method for Members to communicate among themselves and with the Board of Directors regarding any matter concerning the Association according to the procedures set forth in the POAA, as may be amended.

(8) Membership rights which are held by a partnership, corporation, joint venture, or other such entity shall be exercised only by the representative of such Owner who is so designated in writing to the Secretary of the Association.

(c) **Member Responsibilities.**

(1) Members shall comply with the provisions contained in this Deed and with Rules and Regulations adopted by the Board of Directors as authorized by the Reston Documents.

(2) Owner Members shall be personally liable, jointly and severally, for the payment of all Assessments and charges that are assessed against their Lot during the period of their ownership and as provided in Deed Section V.1.

**Section III.4. Member Voting.**

(a) **Manner of Voting.** Because of the size of the Association, no substantive votes will be conducted at Annual or Special Meetings of Members. Where a vote of the Members is required by the Reston Documents or required by law to be taken at a meeting, such vote will be by referendum in lieu of the meeting. Members shall vote by referendum ballot which shall be the equivalent of a proxy directing the Secretary to cast only such votes, pursuant to Deed Section III.4(c), as are specifically set forth on such ballot, as specified by the Board of Directors and the Elections Committee. Referendum votes shall be conducted by mail, or electronically, or as otherwise determined by the Board of Directors or Elections Committee.

(b) **Voting Rights.**

(1) Category A Members. For purposes of electing Directors: voting on amendments to the Reston Documents; and such other matters as may be provided for in the Reston Documents; or brought to them by the Board of Directors, a Category A Member shall be entitled to cast one vote per Lot owned. No more than one Category A vote per Lot may be cast.

(2) Category B Members.

(i) For purposes of electing the Director provided for in Deed Section III.5(a)(1) and voting on amendments as provided in Deed Section VIII.2(b), each Category B Member shall have the number of votes equal to the number of Apartment Units constructed on his Lot or Lots.

(ii) For purposes of voting on amendments to provisions of the Reston Documents, other than those enumerated in Deed Section VIII.2(b): and such other matters as may be provided for in the Reston Documents; or brought to them by the Board of Directors, each Category B Member shall have one vote for each Lot owned on which a Multifamily Dwelling is constructed.

(iii) Upon termination of the Category B membership, each such Member shall become a Category A Member, entitled to exercise one vote for each Lot owned.

(3) Category C Members. For purposes of electing Directors, a Category C Member shall be entitled to cast one vote for the residential unit he occupies. No more than one Category C vote per unit may be cast. Except as may be provided in the Bylaws, in all other cases a Category C Member shall not be entitled to vote.

(c) **Exercise of Vote.**

(1) Association Votes. If the Association is an Owner, all of its votes shall be counted for the purpose of establishing a quorum and, the Association, acting through its Secretary, shall be deem to have cast its votes with the majority of the votes cast on any issue with respect to any Lot it owns.

---

(2) Multiple Person Owners. If more than one natural person is entitled to a vote, such vote may be exercised by any one of them, unless any objection or protest by another holding that vote is made prior to the completion of a vote, in which case the vote for such membership shall not be counted.

(3) Other Members. If an Owner is a partnership, corporation, joint venture, limited liability company, or other legal entity, the vote by such Owner shall be exercised only by a natural person named in a certificate signed by an authorized officer, partner, member, or trustee of such Owner and filed with the Secretary. Any vote cast by a natural person on behalf of such Owner shall be deemed valid unless successfully challenged within seven days after the deadline for voting by the Owner entitled to cast such vote. Such certificate shall be valid until revoked by a subsequent certificate similarly signed and filed.

(4) Aggregate Voting. When more than one category of Members are entitled to vote on an issue, the votes of all Members voting shall be counted together as one class for purposes of determining participation and a majority.

(5) Multiple Votes. Any person or entity qualifying as a Member of more than one voting category may exercise those votes to which he is entitled for each such category.

(6) Delinquency and Default. No Member may vote at any meeting of the Association or be elected to serve on the Board of Directors if: (i) payment by such Member of any financial obligation to the Association is delinquent more than sixty days and the amount necessary to bring the account current has not been paid at the time of such meeting or election; or (ii) such Member has received notice of any other default under the Reston Documents and has not timely cured (or commenced to cure) such default.

(d) **Referenda.**

(1) Voting. Elections and matters requiring a membership vote shall be determined by referendum submitted in a ballot indicating the name and property address of the Member provided to such Member by mail, or by electronic means subject to Rules and Regulations adopted by the Board of Directors, or at polling places in Reston. Ballots shall be returned to the Secretary or such other designated Officer by the date specified on the ballot.

(2) Administration. The Board of Directors shall determine the method and manner of voting, the form of all ballots, the wording of questions thereon, and the deadline for return of ballots. The Board of Directors shall designate the number and location of polling places, if any. The Board of Directors may adopt such rules and any regulations as it deems advisable for any voting by Members, in regard to proof of membership in the Association, evidence of the right to vote, the appointment and duties of inspectors of votes, and such other rules as it deems fit.

(3) Prior Hearing. Except for elections, prior to a referendum the Board of Directors shall provide Notice, pursuant to Deed Section I.1(bb)(1), for and conduct a public hearing on all matters to be decided.

(4) Quorum. Unless otherwise provided by the Deed, the quorum for a referendum shall be ten percent of the votes of Members entitled to vote. The percent and quorum of Category A and B Members shall be an aggregate pursuant to Deed Section III.4(c)(4).

(e) **Record Date to Determine Member.** The date for determining which Members are entitled to vote by referendum ("Record Date") shall be the close of business on the tenth business day before the effective date of the notice to the Members of the referendum, unless the Board of Directors shall determine otherwise. The Board of Directors shall not fix a Record Date more than seventy days before the date of the action requiring a determination of the Members, nor shall the Board of Directors set a Record Date retroactively. At least ten days before each action requiring a determination of the Members, the Secretary shall make a complete list of Members, with the address of each, available for review by the Members. The list shall be current as of the Record Date.

(f) **Notice of Referenda.**

(1) Provision of Notice. Notice of a referendum shall be provided to all Members entitled to vote at least ten days and no more than fifty days prior to such referendum, pursuant to Section I.1(bb)(2) of the Deed. In lieu of providing Notice required above, the Association may provide Notice by electronic means, subject to any rules and regulations adopted by the Board of Directors.

(2) Content of Notice. The Notice shall specify the matters to be voted upon and the method of voting.

(3) Dissenting Opinion. In the case of amendments to the Reston Documents or any ballot question which is accompanied by a recommendation of the Board of Directors, if three or more Directors dissent from the Board of Directors recommendation, the Board shall make a good faith effort to present the minority view in the material accompanying the ballot. Any challenge to the adequacy of such presentation shall not serve to invalidate the vote.

## Section III.5. The Board of Directors.

(a) **Number and Composition.** The Board of Directors shall consist of nine Directors. Two or more seats may not be held by the same person. Category B Members shall have the right to elect one Director. The remainder of the Directors shall be elected by the voting Members other than the Category B Members.

(1) Category B Director. One Director shall be elected by the Category B Members for a three-year term. Upon expiration of the Category B membership, pursuant to Deed Section III.3(a)(2), such seat shall be declared vacant and convert to an at-large elected seat which may be filled as provided in Deed Section III.5(d)(3).

(2) Category A and C Directors.

(i) Number. There shall be at least three and no more than six at-large Directors, elected by all Category A and C Members, pursuant to any resolutions adopted by the Board of Directors. Directors must be residents of the Property throughout their term.

(ii) Districts. There shall be at least three and no more than four district Directors, each of whom shall be a resident of a different district, as provided in paragraph (iii) below, elected by the Category A and C Members, who reside in his district. These Directors must be residents of the district to which they were elected throughout the duration of their term. No Member may seek election in any one year in more than one district.

(iii) District Boundaries. Each district shall be designated on a map of the Property by the Board of Directors, such map to be maintained by the Secretary. Each district shall have substantially similar voting strength and shall elect one Director from among the Members in that district. District boundaries shall be fixed or amended only by a two-thirds vote of the Board of Directors after Notice, pursuant to Deed Section I.1(bb)(1) to the Members and a hearing thereon. Any change in the number or boundaries of districts shall not operate to shorten the term of any incumbent.

(b) **Term of Board Directors.** Directors shall serve three-year terms and until their respective successors are elected. The terms of Directors elected by Category A and C Members shall be staggered such that the term of at least one at-large Director and one district Director shall expire each year. Except for the Director elected by the Category B Members, no Member may serve for more than two consecutive three-year terms as a Director, regardless of whether as a district Director or an at-large Director or any combination thereof. A Member may be eligible to serve as a Director for an additional set of two consecutive three-year terms after a one-year interval from the expiration of his term or resignation. A Director that has served more than half a term is considered to have served a full term.

(c) **Elections Committee.** At least sixty-five days prior to each annual election, the Board of Directors, pursuant to Bylaws Section IX.4, shall appoint an Elections Committee consisting of at least three but not more than five Members (none of whom shall be Officers, Directors or candidates). The terms of the committee members shall be for three years, staggered so that at least one member is appointed or reappointed each year. The Elections Committee shall develop election procedures and administer such procedures as are approved by the Board of Directors providing for election of Directors by a vote of the Members. Meetings of the Committee shall be governed pursuant to Bylaws Section IX.5.

(d) **Director Removal, Resignation, and Vacancies.**

(1) Removal. Any Director may be removed only for cause through a referendum by a majority vote of the Members entitled to elect such Director and a successor may then and

there be elected to fill the vacancy thus created. For the purposes of this Section only, a referendum to remove a Director for cause may be called by a petition which is signed by at least ten percent of the Member Category entitled to elect such Director. Any person whose removal has been proposed by the Board of Directors or the Members shall be given at least seven days notice of the time, place, and purpose of the meeting and shall be given an opportunity to be heard at a public hearing.

(2) Resignation. A Director may resign at any time either in person at a meeting of the Board of Directors or by giving written notice to an Officer. Resignation of a Director is effective when delivered unless the notice specifies an effective date, which is not more than thirty days after the date of the notice. A Director shall be deemed to have resigned and his membership on the Board of Directors shall be terminated immediately upon occurrence of any one of the following events: (i) conviction by a court of a crime involving moral turpitude or a breach of fiduciary duty toward the Association; (ii) failure to disclose a conflict of interest pursuant to Bylaws Section XI.2 on any matter on which he or she votes; (iii) absence from three consecutive meetings without sufficient cause as defined by any resolution by the Board of Directors; or (iv) failure to meet the qualifications for Directors pursuant to Bylaws Section V.1(d).

(3) Vacancies. A vacancy of a Director seat may be filled by appointment by the remaining Directors, even if less than a quorum, until the next annual election at which time the Category A and C Members shall elect a Director to fill the unexpired term. A vacancy in the Category B Director seat shall be filled by a majority of the votes of the Category B Members, until the next annual election, at which time the Category B Members shall elect a Director to fill the unexpired term.

(e) **Board of Directors Responsibilities.** The Board of Directors shall have all powers necessary and appropriate for carrying out the purposes of the Association which are enabled by law or the Reston Documents and which are not specifically reserved to Members or the DRB.

## Section III.6. The Design Review Board.

(a) **Number and Composition.** The DRB shall consist of nine Category A Members, six of whom shall either be architects, landscape architects, and/or land planners ("design professionals"), and three Category A Members who need not be architects, landscape architects, and/or land planners ("lay members"). The Board of Directors shall appoint the DRB members whose term of office shall be for three years, staggered so that at least three members are appointed or reappointed each year.

(b) **Design Review Board Member Removal, Resignation, and Vacancies.**

(1) Removal. The Board of Directors may remove a DRB member in accordance with the provision for removal of Directors in Deed Section III.5(d)(1).

(2) Resignation. A DRB member may resign at any time either in person at a meeting of the DRB or by giving written notice to an officer of the DRB. Resignation of a

---

DRB member is effective when delivered unless the notice specifies an effective date, which is not more than thirty days after the date of the notice.

(3) Vacancies. Except in cases of resignation or removal, a DRB member shall serve until a successor is appointed.

(c) **Design Review Board Compensation and Funding.**

(1) DRB members shall not receive any compensation for their services as such, but the Board of Directors may provide for reimbursement of expenses related to their service. Nothing herein shall be construed to preclude any design professional member of the DRB from serving the Association in any other capacity and receiving compensation.

(2) The Board of Directors shall provide adequate funding and staff support for the operations of the DRB.

(d) **Design Review Board Responsibilities.**

(1) The DRB shall have the power to interpret, administer, and render decisions involving the design covenants in Deed Section VI.1 in accordance with duly adopted and published Design Guidelines, as amended and approved by the Board of Directors, after Notice pursuant to Deed Section I.1(bb)(1) and hearing, all as provided in this Deed. The Board of Directors shall have the power to enforce such Design Guidelines.

(2) The DRB shall be considered an independent agency of the Association. It shall have the authority to bind the Association for purposes of implementing its powers as defined in Deed Section III.6(d)(1) the DRB shall not have standing to sue in its own name. The Association, acting through its Board of Directors, shall have the power to enforce any decision of the DRB.

(3) The DRB shall have the power to impose reasonable application fees (as well as the costs of reports, analyses, or consultations required in connection with proposed improvements or changes) on applicants who are not Members. Such fees shall be assessed against the applicant, provided, however, that the DRB shall inform the applicant of the potential fees before incurring or assessing such fees and the applicant shall have the option to withdraw the application.

(4) The DRB shall administer the Design Covenants set forth in Deed Section VI.1 as follows:

(i) propose amendments to the Design Guidelines to the Board of Directors;

(ii) develop administrative and application procedures which shall be subject to the approval of the Board of Directors and included in the Design Guidelines;

(iii) require every applicant to submit with their application the signatures of at least three different Lot Owners adjacent to or within view of the applicant's

---



alteration or improvement, at least one of which shall be from an adjacent Lot Owner. In addition, if the applicant's Lot is within a Cluster Association at least one of the signatures must be that of a Cluster officer. The required signatures are merely an acknowledgement of the applicant's submission to the DRB and are in no way to be considered either an approval or disapproval of the pending application. At the discretion of the DRB, applications that the DRB determines to have a wider impact on the community may be required to provide additional notice beyond the signatory requirements of this provision.

(iv) review and render decisions on applications for improvements and alterations to the Property and for the cutting down of trees, in accordance with the Design Guidelines;

(v) acknowledge receipt of a signed application, complaint, request, or other communication within seven business days after receipt. The DRB shall respond within sixty days after its receipt of a complete application in the form prescribed by the DRB;

(vi) deliver notice, in accordance with the POAA, as may be amended, and any rules and regulations adopted by the Board of Directors, of the decision to the applicant and all Affected Parties. If the decision is made by a DRB panel, notice of the decision shall also be given to the full DRB. Any DRB member may request that a decision be referred to the full DRB for review and possible modification before the decision is made final. If the applicant has not been advised in writing of the DRB's decision within thirty days after submitting a correctly filed application, the applicant shall notify, by certified mail or telegram, the DRB secretary of this fact and, if the DRB secretary fails to respond within ten days of such notice, approval shall be deemed granted;

(vii) consider and decide appeals from applicants or any Affected Parties. DRB members involved in making the original decision shall be disqualified from voting on an appeal, unless the original decision was made by the full DRB. In the case of a tie vote on an appeal, the appellant may further appeal to the Board of Directors; and

(viii) consider requests for temporary exception permits which it may grant, with cause, by a two-thirds vote of its members. Any temporary exception permit granted shall be time limited and in no event shall be granted for a period greater than twelve months. No extensions beyond the initial period shall be granted or valid.

(e) **Rights of the Design Review Board.** The DRB may:

(1) designate, by resolution, certain categories of applications which may be approved by designated staff;

(2) designate a panel or panels of its members, each consisting of at least two design professionals and at least one lay-member, to perform such functions as may be delegated by the DRB; and

(3) require applicants to provide other documents or specifications, as described in the Design Guidelines or prescribed by the DRB.

### Section III.7. The Covenants Committee.

(a) **Number and Composition.** The Board of Directors, pursuant to Bylaws Section IX.4, shall appoint a Covenants Committee comprised of six Category A Members, of which two shall be at-large Members and four shall be district Members, each of whom shall be a resident of a different district. These Committee members shall maintain a residence within their respective districts throughout their term.  The terms of the Covenants Committee members shall be for three years, staggered so that at least one member is appointed or reappointed each year. Meetings of the Committee shall be governed pursuant to Bylaws Section IX.5.

(b) **Covenants Committee Responsibilities.** The Covenants Committee shall administer the Use and Maintenance Covenants set forth in Deed Section VI.2. In connection with such duties, it shall:

(1) consider and decide violations cases, in accordance with adopted procedures, after affording the alleged violator an opportunity to be heard;

(2) develop Use and Maintenance Standards which shall be subject to the approval of the Board of Directors;

(3) acknowledge receipt of a signed application, complaint, request, or other communication within seven business days after receipt. The Covenants Committee shall respond within sixty days after its receipt of a complaint in the form prescribed by the Covenants Committee;

(4) have the power of the Board of Directors to suspend a Member's right to use the Common Area, facilities, or services pursuant to Deed Sections IV.2(b) and VI.2(d), from persons who, in the judgment of the Covenants Committee, are found in violation of the Use and Maintenance Covenants, Use and Maintenance Standards, or any Rules and Regulations adopted by the Board of Directors; and

(5) consider requests for temporary exception permits which it may grant, with cause, by a two-thirds vote of the Covenants Committee members.

(c) **Appeals.** Appeals of Covenants Committee decisions may be submitted in writing by any aggrieved party to the Board of Directors which shall thereupon decide if it will consider the appeal. The Association shall have the power to enforce any decision or amend, modify, or repeal any decision of the Covenants Committee.

---



### Section III.8. The Legal Committee.

(a) **Number and Composition.** The Board of Directors, pursuant to Bylaws Section IX.4, shall appoint from among the Officers and its members a Legal Committee consisting of five persons. The terms of the Legal Committee members shall be for one year. Meetings of the Committee shall be governed pursuant to Bylaws Section IX.5.

(b) **Legal Committee Responsibilities.**

(1) The Legal Committee, on behalf of the Board of Directors and the Association, shall decide all proposed enforcement actions, imposition of sanctions and filing of legal proceedings, subject to the Board of Directors approval.

(2) The Legal Committee shall also have the power to: (i) impose reasonable charges upon; (ii) suspend the right of use of Common Area, facilities, services or participation in programs; and (iii) issue a cease and desist request to, an Occupant, an Owner, such Owner's tenant, and such Owner's (or tenant's) household, guests, employees, agents, and invitees whose actions are inconsistent with the provisions of the Association Documents, Maintenance and Use Standards, or the Rules and Regulations.

### Section III.9. Disclaimer of Liability.

(a) **Bailee.** The Board of Directors, the Association, and any Member shall not be considered a bailee of any personal property stored or placed on the Common Area including property located in vehicles parked on the Common Area, whether or not exclusive possession of the particular area is given to a Member for parking or otherwise, and shall not be responsible for the security of such personal property or for any loss or damage thereto, whether or not due to negligence, except to the extent covered by insurance in excess of any applicable deductible.

(b) **Operational.** The Association shall not be liable for any failure of services to be obtained by the Association or paid for as a Common Expense, or for personal injury or property damage caused by the elements or by any Member, or resulting from electricity, water, snow, or ice which may leak or flow from or over any portion of the Property or from any pipe, drain, conduit, appliance, or equipment, or any secondary or consequential damages of any type. No diminution, offset, or abatement of any Assessments shall be claimed or allowed for inconvenience or discomfort arising from the making of repairs or improvements to the Property by the Association or from any action taken by the Association to comply with any law, ordinance, or with the order or directive of any governmental authority. This Section is not intended nor shall it be construed to relieve any insurer of its contractual obligations under any policy benefiting the Association or a Member.

### Section III.10. Use of Reston Association Name.
No person or entity shall use the "Reston Association" name or logo in any advertising of or for Lots or the Property in print, radio, television, or any other media without prior written approval by the Association of: (i) the typeface of the name "Reston"; and (ii) the appearance of the logo. The Association expressly retains the right at all times to modify the appearance of the logo (except that any exercise of such right after an approval of the previous appearance of the logo must occur reasonably and with reasonable notice

*17*

of the logo change to the person or entity to which the previous approval was given). The Association also reserves the right to prohibit and to enjoin any advertising whatsoever which the Association determines contains any false or misleading facts, information, or representations with respect to the Association, the Property, or any part thereof.

## Article IV Common Area

**Section IV.1. Obligation of the Association.** The Association shall be responsible for the management and Upkeep of all of the Common Area, including Limited Common Area and Reserved Common Area pursuant to Deed Sections IV.5 and IV.6 and any easements or licenses to real property granted to the Association pursuant to such easement or license agreement. Such Upkeep of Common Area shall include without limitation (except to the extent performed by Fairfax County or any other governmental entity): (i) Upkeep of all open areas, including grass cutting, landscaping and lawn maintenance; (ii) Upkeep of the Common Area sidewalks, trails and parking areas; (iii) Upkeep and operation of all recreational facilities located on the Common Area; and (iv) Upkeep of all other improvements located on the Common Area. The Association shall not have any responsibility for the Upkeep of any Lot except for those responsibilities and duties specifically enumerated within the Reston Documents for Lots pursuant to this section and other areas described in the subdivision documents for the Property or separate easement agreements. Notwithstanding the general provisions for Upkeep of Common Area set forth in this section, other specific Upkeep responsibilities and allocations of Upkeep costs shall be determined by any provisions therefor indicated in either a Supplementary Declaration or plat recorded when subjecting such Common Area to the Deed.

**Section IV.2. Members' Easement of Use and Enjoyment.** Every Member shall have an easement of use and enjoyment over the Common Area, subject to the following:

(a) The Board of Directors shall have the right to establish, adopt, enforce, and repeal Rules and Regulations and set reasonable admission and other fees for the use of the Common Area and participation in Association programs. The Board of Directors shall make available copies of the Rules and Regulations to each Member requesting the same. Changes to the Rules and Regulations shall be published prior to the time when the same shall become effective and copies thereof shall be made available to each Member requesting the same.

(b) The Board of Directors, Covenants Committee, or the Legal Committee as appropriate, shall have the right to: (i) suspend a Member's right to use the Common Area, recreational facilities, or participate in programs offered by the Association for any violation of this Deed, the Bylaws, or Rules and Regulations for which the Member or his family members, tenants, guests, or other invitees are responsible, for the duration of the existence of the violation, or for an additional time for health and safety reasons, and for non-payment of Assessment, program fees, covenants violation costs, or charges or attorneys fees related to such violation which are more than sixty days past due, to the extent that access through the Common Area is not precluded and provided that such suspension shall not endanger the health, safety, or property of the Member, tenant, or occupant; and (ii) assess charges against a Member for any violation of the Deed, the Bylaws, or

---

Rules and Regulations for which the Member or his family members, tenants, guests, or other invitees are responsible.

(c) Before any charges or suspension may be imposed, except for an immediate suspension for health and safety reasons, the Member, after receiving Notice, pursuant to Deed Section I.1(bb)(2), shall be given the opportunity to be heard before the Covenants Committee or Legal Committee as appropriate. The POAA, as amended, shall control the requirements for any notice of hearing, the conduct of the hearing, and the Notice, pursuant to Deed Section I.1(bb)(2), of the hearing results.

(d) The Board of Directors shall have the right to permit non-Members to use the recreational facilities of the Association and other Common Area, and to establish if it sees fit, different fees for use by Members and non-Members.

(e) Such restrictions as may exist in any deed conveying portions of the Common Area to the Association.

(f) The Board of Directors shall have the right to convey, mortgage, encumber, or dedicate the Association's assets including the Common Area, as follows:

(1) dedicate, convey, abandon, encumber, partition, or mortgage Common Area, subject to the prior approval of the Board of Directors and more than a two-thirds vote, pursuant to the provisions of Deed Section III.4, of Category A and B Members in a referendum in which at least thirty percent of such Members participate; provided, however, that membership approval shall not be required for voluntary conveyance of land that would otherwise be taken or which could be taken by the power of eminent domain;

(2) make conveyances or resubdivisions as part of boundary-line adjustments;

(3) exchange improved or unimproved land, subject to the approval of the Board of Directors, and after a public hearing for which Notice has been provided to the Members; and

(4) to Cluster Associations or other associations organized for similar purposes, provided such conveyed area shall remain as open space as defined by the Fairfax County Zoning Ordinance.

(g) The right of the Board of Directors to grant easements or the right of access over the Common Area.

(h) The right of the Board of Directors, on behalf of the Association, to enter into agreements, business arrangements, and business entities, including but not limited to partnerships, limited liability companies, and consortiums, for the purpose of purchasing and improving real property, including Common Area, for purposes intended for the use and benefit of the Association, including but not limited to the building of a commercial office to serve as the Association's headquarters and administrative offices.

**Section IV.3. Conveyance of Real Property to Reston Association.** Subject to securing the applicable permits, unimproved or improved real property may be conveyed to the Association to be held as Common Area or improvements may be constructed on the Common Area which shall thereafter be the property of the Association, provided such real property is conveyed or improvements constructed free and clear of financial encumbrances. Except for unimproved real property, such conveyance or construction must have the prior approval of the Board of Directors.

**Section IV.4. Protection of Common Area.** No Common Area may be subdivided, altered or modified except as provided herein without the prior approval of the DRB and, if required, by the Zoning Ordinances of Fairfax County.

**Section IV.5. Reserved Common Area.** The Board of Directors shall have the power in its discretion from time to time to grant revocable licenses in the Common Area by designating portions of the Common Area as Reserved Common Area. This right extends to Common Area that has been assigned as Limited Common Area for the primary use of the Owners of a group of Lots, so long as the assignment of Reserved Common Area is to one of the Owners of the Lots that have been designated to receive the primary use of such Limited Common Area. Such Reserved Common Area shall be subject to such restrictions, reasonable charges and conditions on the use thereof as the Board of Directors may deem appropriate. At the sole option of the Board of Directors, Upkeep of such Reserved Common Area shall be performed by the Association and paid for as a Common Expense or a Limited Common Expense, or performed and paid for by the persons having the exclusive right to use the Reserved Common Area. Such Reserved Common Area shall be subject to such restrictions, reasonable charges, and conditions on the use thereof as the Board of Directors may deem appropriate.

**Section IV.6. Limited Common Area.** In the event of Additions to Existing Property, pursuant to Deed Section II.2, the Association shall have the right to restrict portions of the Common Area in the nature of an easement for the exclusive use of the Owners of one or more specific Lots by designating such portions of the Common Area as Limited Common Area upon the acquisition of such Common Area. The Association may: (i) describe the location of the Limited Common Area and the Lots to which it is appurtenant in a Supplementary Declaration; or (ii) indicate the locations of the Limited Common Area appertaining to one or more Lots by depicting such Limited Common Area and the Lots to which it is appurtenant on a plat attached as an exhibit to a Supplementary Declaration.

**Section IV.7. Condemnation.**

(a) **Definition.** For the purposes of this Article, "Taking" means an acquisition of all or any part of the Common Area or of any interest therein or right accruing thereto as a result of, in lieu of, or in anticipation of the exercise of the right of condemnation or eminent domain, or a change of grade caused by the action of a governmental entity affecting the value of the Common Area or any part thereof so severely as to amount to condemnation.

(b) **Taking of Common Area.** If there is a Taking of all or any part of the Common Area, then the Association shall notify the Members, but the Board of Directors shall act on behalf of the

Association in connection therewith and no Member shall have any right to participate in the proceedings incident thereto. The award made for such Taking shall be payable to the Association.

**Section IV.8. Standards for Common Area Upkeep.** The Common Area shall be subject to the Use and Maintenance Standards and, at a minimum, shall be sufficient to meet the requirements of applicable law and governmental regulations. The Board of Directors may also determine to provide for the Upkeep of the medians and rights-of-way along dedicated streets and roadways to the extent not provided by the appropriate governmental agency.

**Section IV.9. Manner of Repair and Replacement.** All ordinary repairs and replacements shall be substantially similar to the original construction and installation, and shall be of first-class quality, but may be made with contemporary materials if permitted by the Design Guidelines. Complete replacement of an improvement by the Association need not be similar to the original construction and may vary in size and design.

**Section IV.10. Additions, Alterations, or Improvements to Common Area.** If the Board of Directors wishes to make a single capital addition, alteration, or improvement to the Common Area (other than for Upkeep), including without limitation the conversion of a seasonal recreational facility to a year-round recreational facility, having an aggregate construction cost, exclusive of interest, in excess of three hundred sixty-nine thousand dollars as determined pursuant to Generally Accepted Accounting Principles, then the making of such addition, alteration, or improvement requires a majority vote of the Members entitled to vote, and the Board of Directors shall pay the cost from existing funds or assess all Members benefited for the cost thereof as a Common Expense or Limited Common Expense, depending on the nature of the improvements. Any other single capital addition, alteration, or improvement to the Common Area (other than for Upkeep) costing three hundred sixty-nine thousand dollars or less as determined pursuant to Generally Accepted Accounting Principles may be made by the Board of Directors without approval of the Members and the cost thereof shall constitute a Common Expense or a Limited Common Expense, depending on the nature of the improvement. The three hundred sixty-nine thousand dollar limitation shall be adjusted each year by the Percentage Change in the Employment Cost Index. Notwithstanding the foregoing, if the Board of Directors determines that such capital addition, alteration, or improvement is exclusively or substantially exclusively for the benefit of specific Members, such Members shall be assessed therefor in such proportion as they jointly approve by referendum or, if they are unable to agree thereon, in such proportion as may be determined by the Board of Directors. The information provided with any vote under this section shall include a five year statement of projected operating costs. The statement of operating costs shall include only the changes in operating costs, if any, including Upkeep (excluding replacement costs and depreciation), personnel costs, insurance, utilities, and taxes associated with the addition, alteration, or improvement.

# Article V Covenant for Assessments and Fiscal Requirements

**Section V.1. Acceptance.** Each Owner covenants and agrees to pay to the Association, as his personal obligation, such Assessments as are established herein and levied by the Association. No Owner may waive or otherwise escape liability for the Assessments by non-use of the Common



Area, or Common Area facilities, or programs offered by the Association, or abandonment of his Lot. In case of voluntary conveyance, the grantee and the grantor shall be liable, jointly and severally, for any unpaid Assessments outstanding at the time of conveyance.

**Section V.2. Creation of the Lien.** All Assessments shall be a continuing lien upon the real property against which each such Assessment is made. The lien shall attach when the Assessment is established by the Board of Directors and no filing of a memorandum of lien or other action shall be necessary to perfect it.

**Section V.3. Effect of Sale or Transfer of Lot.** The sale or transfer of any Lot shall not affect the lien of Assessments that accrued prior to the date of such sale or transfer. The sale or transfer of any Lot pursuant to mortgage foreclosure shall extinguish the lien of such Assessments as to payments which became due prior to such sale or transfer, and shall not extinguish the personal liability of the Owner for such unpaid Assessments. Mortgage foreclosure shall not extinguish a pro-rata Assessment due for the remainder of the fiscal year from the date of the foreclosure.

**Section V.4. Priority of Lien.** The lien of Assessments provided for herein shall be subordinate to the lien of any first deed of trust, except for Assessments which accrued prior to the date such deed of trust was recorded. The lien of Assessments shall be superior to the lien of any Condominium, Cluster, or cooperative assessment, except for such assessments as shall have accrued prior to the date of establishment of any Association Assessment.

**Section V.5. Annual Assessment.**

(a) **Purpose, Rate, and Calculation of Annual Assessment.**

(1) Common Expense Assessments. Subject to Deed Sections V.5(a)(2) and V.8, the total amount of the estimated funds required for: (i) the management and Upkeep of the Property; (ii) services to the Lots and Owners; (iii) funding capital repairs and replacements; (iv) necessary working capital; and (v) to meet obligations of the Association established pursuant to Deed Section III.2 or other Upkeep agreements shall be assessed annually against the Lots or levied as a Special Assessment.

(2) Limited Common Expense Assessment. Limited Common Expenses shall be assessed only against the Lots benefited in proportion to their relative Common Expense liability inter se or based on usage, as appropriate. Such Limited Common Expenses shall be determined as follows:

(i) any Common Expenses for the Upkeep of or reserves for any Limited Common Area shall be assessed only against the Lots to which such Limited Common Area is appurtenant, provided, however, that Limited Common Expenses for substantially similar purposes may be assessed against all Lots so benefited;

(ii) any Common Expenses designated in a Supplementary Declaration as Limited Common Expenses is to be paid by the Owners of Lots located within the real estate being added;

(iii) any Common Expenses proposed by the Board of Directors or a specific group of Owners as Limited Common Expenses against a specific group of Lots and agreed to by Owners entitled to cast a majority of the total number of votes in a referendum with respect to such Lots, assessed against such Lots as such Owners may agree or on the basis set forth in Deed Section V.5(a)(1) inter se;

(iv) any Common Expenses for trash pick-up, parking lot or open space Upkeep or similar services, if the cost of such service varies significantly between housing types, Lot types or geographical location. The cost of any services or utilities to Lots which vary based on usage shall be assessed against the Lots served based on usage;

(v) any Common Expenses for billing individual Owners liable for such Limited Common Expenses or any similar categories of management overhead associated therewith; and

(vi) limited Common Expense Assessments are not included in or subject to the maximum Annual Assessment.

(b) **Assessment Rates.** Annually the Board of Directors shall fix the amount of the Annual Assessment and set the date or dates such Assessment shall become due. If the Board fails to fix the amount of the Assessment prior to the beginning of any fiscal year, the amount of the previous year's Assessment shall apply to the new year.

**Section V.6. Special Assessment.** The Board of Directors may levy at any time a Special Assessment against some or all of the Lots on the Property, applicable to not more than ten years, for the purpose of defraying, in whole or in part, the cost of any acquisition or construction, reconstruction, repair, or replacement of a Capital Asset upon the Common Area or other property including fixtures and personal property thereon, provided such Special Assessment is approved by a majority vote of those Category A and B Members whose Lots would be subject to the proposed Special Assessment. The percent and quorum of Category A and B Members shall be in aggregate pursuant to Deed Section III.4(c)(4). If a Special Assessment is to be paid in installments, upon default of any such installment, the Board of Director may declare those installments payable within the fiscal year immediately due and payable.

**Section V.7. Basis for Assessments.** Subject to Deed Section V.8, the Basis for Assessments shall be an equal amount for each Apartment Unit or Lot. After filing proof of qualification with the Association, Owners of Lots or Apartment Units may be granted an Assessment reduction, as determined from time to time by the Board of Directors, provided: (i) they qualify for real estate tax reduction by Fairfax County Ordinance; (ii) their units are subsidized by the federal or state government; or (iii) their units are designed and used primarily for elderly congregate care or assisted living facilities and occupied by low or moderate income residents.

**Section V.8. Maximum Assessment.**

(a) In any one year, the sum of the Annual Assessment for Common Expenses and any Special Assessment, attributable to that year, with respect to any Lot shall not exceed the lesser of:

---

23

(1) Percentage Cap. One-half of one percent of the assessed valuation, as determined for tax purposes from time to time by Fairfax County, of such Lot and improvements thereon; or

(2) Maximum Dollar Amount. Four hundred and sixty-one dollars per Lot or Apartment Unit, automatically adjusted as of the beginning of each fiscal year by the greater of four and one half percent or the Percentage Change in the Employment Cost Index. This maximum dollar amount and/or the Employment Cost Index reference date in Section I.1(gg) may be modified or waived for one or more years by a two-thirds vote of the Board of Directors and a majority vote of the Category A Members.

(b) The limitation imposed by this Section shall not apply to any admission or other fees for use of the Common Area established by the Board of Directors, to a Maintenance Assessment under Deed Section V.9 or to other charges enumerated in Deed Section V.10.

**Section V.9. Maintenance Assessment.** The Association may levy a Maintenance Assessment on any portion of the Property whose owner fails to maintain or restore such portion of the Property, as provided in Deed Sections VI.2(a), VI.2(b), VI.1(c) and VI.2(d) and shall be a continuing lien upon that portion of the Property pursuant to Deed Article V, and shall be treated as an assessment against that portion of the Property for the purposes of Virginia Code §55-516 as may be amended. The Assessment shall be limited to the amount necessary to meet the cost of any maintenance or restoration and other charges, if any, as provided in Deed Section V.10 and may be awarded by a court as part of its judgment in any proceeding in law or equity.

**Section V.10. Other Charges.** The Association may charge an owner of any portion of the Property: (i) a late fee on an overdue Assessment not to exceed ten percent of the Assessment; (ii) the costs, including attorney's fees and court costs, for collection of Assessments and of enforcing any of the provisions of this Deed; and (iii) interest on overdue sums, up to the maximum rate permitted by law. Any such charges shall be a personal obligation of the owner of any portion of the Property and shall be added to and become a part of the lienable Assessment on the Lot or portion of the Property. In addition, such charges may be awarded by a court as part of its judgment in any proceeding in law or equity.

**Section V.11. Statement of Common Expenses.** The Board of Directors or Association employees shall provide any Owner or contract purchaser within fourteen business days after a written request therefor (or within such other time period as may be required by law), with a written statement of all unpaid Assessments due with respect to a specific Lot (or a statement that the amount of unpaid Assessments is zero) ("Statement of Common Expenses") as part of the "Association Disclosure Packet" required by the POAA. No contract purchaser requesting such a statement shall be liable for, nor shall the Lot conveyed to such person or entity relying on such statement be subject to a lien for, any unpaid Assessments due prior to the date of such statement in excess of the amount set forth on such statement, provided, however, that this Section shall not be interpreted to release any person or entity from personal liability for such Assessments levied while such person or entity owned the Lot. The Board of Directors may impose a reasonable charge for the preparation of such statement to cover the cost of preparation.

**Section V.12. Transfer Fee; Transfer Fee Credit.**

(a) **Transfer Fee.** Each purchaser of a Lot shall pay to the Association at the time of settlement a "Transfer Fee" initially in the amount of two hundred-fifty dollars. The Board of Directors may increase such fee annually in an amount not to exceed the Percentage Change in the Employment Cost Index for such year. Transfer Fees, at the discretion of the Board of Directors, shall be used for any expenditures incurred by the Association.

(b) **Transfer Fee Credit.** A purchaser of a Lot shall be entitled to have his Transfer Fee applied as a credit to the purchased Lot's next fiscal year Assessment if the purchaser applies, in writing, to the Association for a credit within twelve months of the date of settlement of the Lot and can show written proof to the Association that at the time of purchase he: (1) owned and occupied another Lot; (2) sold such other Lot; (3) now owns, occupies, and resides in the purchased Lot; and (4) does not own any other Lot in Reston. This credit is not available to individuals who lease any Lot, including any purchased Lot.

**Section V.13. Determination of Common Expenses and Budget.**

(a) **Fiscal Year.** The fiscal year of the Association shall be as determined by the Board of Directors.

(b) **Preparation and Approval of Budget.**

(1) After Notice pursuant to Deed Section I.1(bb)(1) and hearing, the Board of Directors shall adopt a budget for the Association on a biennial basis containing an estimate of the total amount considered necessary for the ensuing two fiscal years to pay the cost of management and Upkeep of the Common Area and, to the extent provided in the Association Documents, Upkeep of the Lots, and the cost of other expenses that may be declared to be Common Expenses by the Reston Documents or by a resolution of the Board of Directors for purposes found by the Board of Directors to be in the best interests of the Association, including without limitation services provided to the Owners, Lots, or Common Area.

(2) Such budget shall also include such reasonable amounts as the Board of Directors considers necessary to provide a general operating fund (working capital available for day-to-day expenses and to cover operating losses due to insurance deductibles) and reserves for capital repairs and replacements and may include reserves for contingencies (potential costs or liabilities which have not been incurred but which should be planned for). Before the beginning of each fiscal year, the Board of Directors shall make available a copy of the budget in a reasonably itemized form which sets forth the amount of the Common Expenses. Such budget shall constitute the basis, pursuant to Deed Section V.7, for determining the Assessment against each Lot.

(3) The budget shall also reflect the separate assessment of Limited Common Expenses, if applicable, including without limitation certain expenses (and reserves) relating to or benefiting one or more but less than all of the Lots, whether categorized by location or

type of expense.  Such expenses shall be assessed only against the Lots benefited in accordance with Deed Section V.5(a)(2).

(c) **Installment Payments and Due Dates.**  Any and all such Assessments and other charges shall be a lien against each Owner's Lot as provided in Deed Section V.2. On or before the due date for each succeeding payment period in such fiscal year, each Owner shall pay to the Association at such place as the Board of Directors may direct the payment of the Annual Assessment which is due during such period.  The Board of Directors may establish one or more payment periods and the due dates for each such payment in each fiscal year. All sums collected by the Board of Directors with respect to Assessments against the Lots or from any other source may be commingled into a single fund.

(d) **Unforeseen Expenses.**  The Board of Directors may not commit funds in excess of the budgeted amount, unless approved by a two-thirds vote of the Board of Directors at a regular meeting. In case of emergency, the Board of Directors may commit such funds by a two-thirds vote at any meeting, but shall confirm such action at the next regular meeting.

(e) **Pledge of Revenues.**  The Board of Directors, by a two-thirds vote, shall have the right and power to assign and pledge all revenues to be received by the Association, including but not limited to Annual Assessments and Special Assessments in order to secure the repayment of any sums borrowed by the Association from time to time.

**Section V.14. Reserves and Investments.**  The Board of Directors shall build up and maintain reasonable reserves for working capital, operations (including losses due to insurance deductibles), contingencies, and capital replacements. Such funds shall be a Common Expense of the Association and shall be deposited and invested in accordance with policies and procedures approved by the Board of Directors.  Unless otherwise provided in Deed Section V.8(a), reserves for items serving only certain Lots may be accounted for and funded solely by the Owners of the Lots served (as a Limited Common Expense).

**Section V.15. Surplus and Deficit.**

(a) Any amount accumulated in excess of the amount required for actual expenses and reserves shall, at the discretion of the Board of Directors:  (1) be placed in reserve accounts; or (2) be expended solely for the general welfare of the Owners.

(b) In the event of any net shortage in revenues in any fiscal year: (1) the surplus from preceding years or the general operating reserve can be applied against the deficit; or (2) such net shortage shall be assessed promptly against the Owners as a Special Assessment in accordance Deed Section V.6.

**Section V.16. Optional Service Expenses.**  Upon request, the Association may provide certain services to Owners, Occupants, or Cluster Associations on a contractual basis, provided, however, that the charge for such services shall be assessed against such Owner's Lots, such Occupants or such Cluster Associations in accordance with the terms of the contract.

## Article VI Protective Covenants and Easements

### Section VI.1. Design Covenants.

(a) **Objectives.** The objectives of the design covenants are:

(1) To promote those qualities in the environment which bring value to the Property.

(2) To foster the attractiveness and functional utility of the community as a place to live, including a harmonious relationship among structures, vegetation, and topography.

(b) **Standards.** The DRB shall apply the following standards in making its decisions:

(1) the harmony of the exterior appearance of the proposed improvement or alteration with the overall community design of the Property;

(2) the location of the proposed improvement or alteration, the character of the proposed use, and the effect upon surrounding real property and uses thereof, including pedestrian and vehicular traffic patterns on site, impact of noise and exterior lighting, drainage, Natural Vegetation Area as defined in Deed Section VI.1(c)(5), privacy, obstruction of view, and any other factor which may affect the desirability or suitability of the proposal; and

(3) the character, aesthetics, and quality of the exterior materials and workmanship.

(c) **Requirements.**

(1) Improvements. Unless and until a plan of construction is submitted by the owner of any portion of the Property or the Owner's agent and approved by the DRB, no structure or appurtenance thereto, whether of a temporary or permanent nature and whether or not affixed to the ground, shall be commenced, erected, installed, added, or permitted to remain on the Property. The plans for initial grading and landscaping of any real property shall also require the prior approval of the DRB.

(2) Alterations. Unless and until a plan of alteration is submitted by the owner of any portion of the Property or the Owner's agent and approved by the DRB, no alteration, addition, or repair, including change in exterior color, shall be undertaken which affects the external appearance of any improvements to the Property or of any lake shoreline or which affects drainage patterns or topography.

(3) Change in Use. No portion of the Property or building on the Property shall be used for a type of use other than that for which it was originally designed without the approval of the DRB.

(4) Trees. Mature, live trees on the Property, as defined in the Design Guidelines, may not be cut down or removed without the prior approval of the DRB.

(5) Natural Vegetation Areas.  Those areas indicated as uncleared, undisturbed, tree save, or natural areas on DRB or Fairfax County approved development, site, and/or landscape plans for the Property shall be managed according to the Design Guidelines of the Property.  Consistent with the Design Guidelines for the Property, the natural condition of these areas, including the trees, shrubs, groundcovers, and soils should be preserved and may not be disturbed, cut down, or removed without the prior approval of the DRB.

(6) Signs. No signs shall be erected or installed on a portion of the Property, except: (a) signs approved by the DRB; or (b) signs which do not require DRB review as delineated in the Design Guidelines.

(7) Antenna. No antenna shall be located in any area exposed to view, unless approved by the DRB, provided, however, that the Association shall not prevent access to telecommunications services in violation of applicable federal law.

(d) **Design Guidelines.**

(1) The Design Guidelines are intended to assist the DRB and owners of a portion of the Property in the ongoing process of community design and shall include:

(i) goals and objectives of review;

(ii) principles and criteria used in applying the foregoing Design Guidelines to achieve the required objectives;

(iii) specifications for a plan of construction or alteration;

(iv) review and appeal procedures consistent with the Association Bylaws;

(v) optional, but generally acceptable, methods for achieving the required objectives in particular design problems frequently encountered on the Property;

(vi) materials and related information to be submitted for review; and

(vii) such other topics as may be appropriate or required by the Reston Documents.

(2) Limitations.

(a) Any person or entity obtaining approval from the DRB shall commence construction or alteration in accordance with plans and specifications approved within six months after the date of approval and shall substantially complete any construction or alteration within eighteen months after the date of approval, or within such other periods as are specified in the approval during which to commence or complete construction. If any such person does not commence work within the time period specified, the approval shall lapse.

(b) Any person or entity obtaining approval of the DRB shall not deviate from the plans and specifications approved without the prior written consent of the DRB. Such person or entity shall notify the DRB when the alterations or improvements are complete. Approval of any particular plans and specifications or design does not waive the right of the DRB to disapprove such plans and specifications, or any elements or features thereof, if such plans and specifications are subsequently submitted for use in any other instance or by any other person or entity.

## Section VI.2. Use and Maintenance of Property.

(a) **Use of the Property.** Except as otherwise provided in the Reston Documents, including, without limitation, Deed Section VI.2(b), no Lot shall be used for purposes other than the purposes for which such Lot is zoned and designed and which are permissible under local zoning ordinances. No Lot or the Common Area shall be used for any other purpose without the prior written approval of the Board of Directors or its designee. Approval of other uses may be conditioned or withheld at the Board of Directors discretion. Each Member shall comply with applicable zoning requirements, as amended from time to time.

(b) **Restrictions on Use.** The following restrictions on use shall apply to all Lots, Common Area, and Cluster Common Area within the Property:

(1) No Unsafe Activities. Nothing shall be done or kept on the Property which will increase the rate of insurance for the Common Area or any part thereof applicable for permitted uses without the prior written consent of the Board of Directors or its designee, including without limitation any activities which are unsafe or hazardous with respect to any person or property. No person or entity shall permit anything to be done or kept on the Property which will result in the cancellation of any insurance on the Common Area or any part thereof or which would be in violation of any law, regulation, or administrative ruling.

(2) No Improper Use. No improper, offensive, or other use creating or amounting to a nuisance shall be conducted on the Property or any part thereof.

(3) Harmful Discharges. There shall be no emissions of dust, sweepings, dirt, cinders, odors, gases, or other substances into the atmosphere (other than normal residential chimney emissions), no production, storage, or discharge of hazardous wastes on the Property, or discharges of liquid, solid wastes, or other harmful matter into the ground or any body of water, if such emission, production, storage, or discharge may adversely affect

the use or intended use of any portion of the Property or may adversely affect the health, safety, or comfort of the Members. Neither waste nor any substance or materials of any kind shall be discharged into any public sewer serving the Property or any part thereof in violation of any regulation of any public body having jurisdiction over such public sewer. No person or entity shall allow the escape or discharge of any fumes, odors, gases, vapors, steam, acids, or other substances into the atmosphere which discharge, in the opinion of the Board of Directors or its designated committee, may be detrimental to the health, safety, or welfare of the area which may be harmful to the Property, wildlife, pets, or vegetation.

(4) Obstructions. No person or entity shall obstruct any of the Common Area or otherwise impede the rightful access of any other person on any portion of the Property upon which such person has the right to be. No person or entity shall place or cause or permit anything to be placed on or in any portion of the Common Area without the approval of the Board of Directors or its designated committee. Nothing shall be altered or constructed in or removed from the Common Area except with the prior written approval of the Board of Directors or its designated committee.

(5) Association Property. The improvements located on the Common Area, if any, shall be used only for their intended purposes. Except as otherwise expressly provided in the Reston Documents, no Member shall make any private, exclusive or proprietary use of any of the Common Area (except those areas, if any, designated as Limited Common Area or Reserved Common Area) without the prior written approval of the Board of Directors or its designated committee, and then only on a temporary basis.

(6) Vegetation. No tree or plant of any kind shall be installed or maintained in such a manner as to obstruct pathways, sidewalks or sight lines of vehicular traffic or, in the opinion of the Board of Directors or its designated committee, as to be detrimental to neighboring real property.

(7) Erosion. Adequate vegetative cover or soil stabilization must be maintained to prevent detrimental aesthetic and environmental impacts on the Property or neighboring real property.

(8) Refuse and Debris. Storage or disposal of refuse or debris on the Common Area or in the lakes is prohibited. Storage of refuse or debris exposed to view is prohibited on any other part of the Property, except for temporary placement of such refuse awaiting pickup.

(9) Boats. Except for emergencies or Association authorized maintenance, no boats greater than eighteen feet in overall length and ten feet in overall width and no boats powered by or equipped with internal combustion engines shall be allowed on the lakes.

(10) Vehicles. No vehicle or trailer may be parked or kept on a portion of the Property except on driveways or in parking areas approved by the DRB. No motorized vehicles shall be permitted on pathways or unpaved Common Area except for public safety vehicles and for Association authorized maintenance vehicles.

(11) Utility Lines. Except for overhead lines in place prior to the acceptance of the Reston Master Plan, no overhead utility supply lines, including for cable television, shall be permitted on the Property, except for temporary lines as required during construction.

(12) Non-residential Use. Residential real property shall be used only for residential purposes and such accessory uses and home occupations as permitted by the Use and Maintenance Standards adopted and published by the Board of Directors; except, residential units may be used as model homes or temporary real estate sales offices by a developer or those builders selling or leasing residential units on the Property.

(13) Outdoor Drying Lines. No laundry or clothing shall be aired or dried in any area exposed to view. Outdoor drying areas are permitted only in screened or fenced locations approved by the DRB.

(14) Animals. No animals, livestock, or poultry of any kind shall be raised, bred, or kept on any Lot, except a reasonable number of common household pets may be kept, as long as they are not raised, bred, or kept for commercial purposes, and the number does not violate Fairfax County ordinances.

(15) Air-Conditioning Units. In any residential Cluster in which central air-conditioning service is available to the Lot line, no individual air-conditioning units of any type shall be permitted. This covenant may only be amended or revoked by at least a two-thirds vote of the Category A Members of all residential Clusters on the service.

(16) Hunting and Firearms. Except in any emergency situations related to life, safety, or personal welfare, no hunting of any kind or discharge of any firearm or other weapon, including without limitation a bow and arrow or crossbow, shall be permitted7 without the prior written approval of the Board of Directors or its designated committee.

(17) Home Offices or Home Businesses. No residential Lot or Multifamily Dwelling shall ever be used for any business, commercial, manufacturing, mercantile, storage, vending, sales, or other non-residential purpose, provided, however, that a Member may maintain an office or home business in the improvement on such Member's Lot if: (i) such office or home business is operated by the Member or a member of the Member's household residing on the Lot; (ii) there are no displays or signs indicating that the Lot is being used other than a residence except with the prior written approval of the Board of Directors or its designated committee; (iii) such office or business does not generate significant traffic or parking usage (as determined by the Board of Directors or its designated committee) by clients, customers, or other persons related to the business; (iv) no equipment or other items related to the business are stored, parked, or otherwise kept on such Member's Lot or the Property outside of an approved enclosure, except with the prior written approval of the Covenants Committee; (v) such Member has obtained any required approvals for such use from the appropriate local governmental agency; (vi) the activity is consistent with the residential nature of the Property and complies with local ordinances; and (vii) the improvement on such Member's Lot is used primarily as a residence.

(18) Restoration. A building on a portion of the Property, the external appearance of which has been damaged or destroyed by fire or other casualty, shall be restored substantially to its original appearance in a reasonable time, unless otherwise approved by the DRB.

(c) **Maintenance of Improvements.** Each owner of any portion of the Property shall keep all improvements owned by him in good order and repair, such that the appearance of that portion of the Property, in the opinion of the Board of Directors or its designated committee, is not detrimental to adjoining properties and is consistent with the maintenance standards in the Design Guidelines.

(d) **Failure to Maintain.** If an owner fails to maintain his portion of the Property in accordance with Deed Sections VI.2(a), VI.2(b) and VI.2(c), his improvements in accordance with Deed Section VI.2, or restore his improvements in accordance with Deed Section VI.2(c), the Board of Directors may: (i) cause the necessary work to be performed; and (ii) seek to obtain a mandatory injunction from a court of competent jurisdiction requiring the owner to perform the necessary maintenance or restoration, or to permit the Association to enter that portion of the Property to perform the necessary work. At least fourteen days prior to commencing such work, the Board of Directors shall give the owner Notice of the intent to take such action, pursuant to Deed Section I.1(bb)(2) and afford the owner an opportunity to be heard. After taking such actions, including without limitation the costs associated with obtaining an mandatory court injunction, the Board of Directors shall assess a Maintenance Assessment as provided in Deed Section V.9.

(e) **Emergency Action.** Nothing in the Association Documents shall prevent an Owner or Cluster Association from taking any immediate and reasonable lawful action, without prior approval, to eliminate any hazardous condition that poses an imminent risk of personal injury, death, or property damage. Any such condition and the action taken must be documented in writing by the Owner or Cluster Association and submitted to the Association within five days after the action was taken.

**Section VI.3. Resale of Lots.**

(a) **Reference to Deed.** The deed or instrument transferring title to any Lot shall contain a provision incorporating by reference the provisions of this Deed, as well as any applicable Supplementary Declaration. Notwithstanding failure to include a reference to this Deed in a deed or instrument transferring title to a Lot, the covenants, restrictions, easements, charges, and liens set forth herein shall encumber the Lot as though reference thereto was set forth in such deed or instrument.

(b) **Notification.** The contract seller of a Lot shall notify the Association of the name of the contract purchaser and the scheduled date and place of settlement.

(c) **Association Resale Disclosure.** The Board of Directors shall, upon request from a contract seller of a Lot, and upon payment of the applicable fee, furnish an Association Disclosure Packet as required by applicable Virginia law and a Statement of Common Expenses in accordance with Deed Section V.11.

32

**Section VI.4. Easements.**

(a) **By the Association.** Provided no other reasonable access is available, the Association shall have an easement of ingress and egress over the Property for the repair and maintenance of the Common Area and for enforcement of this Deed.

(b) **Conditions.** The foregoing rights of easement shall be exercised only after at least fourteen days Notice, pursuant to Deed Section I.1(bb)(1), is given to affected Owners, unless an emergency exists which precludes such Notice. Any real or personal property damaged shall be restored promptly to its original or equivalent condition at the expense of the party causing such damage.

# Article VII Clusters

## Section VII.1. Cluster Associations.

(a) **Creation.** Any portion of the Property may also be subjected to a separate Cluster declaration, articles of incorporation, and bylaws (collectively known hereinafter as "Cluster Documents") which address concerns particular to that specific portion of the Property. Any obligations created under any such Cluster Documents shall be in addition to obligations created hereunder. Prior to the conveyance of the first Lot within a Cluster to an Owner, a Cluster Association may be formed as a nonstock corporation, limited liability company, or other entity authorized under the laws of Virginia.

(b) **Purposes.** A Cluster Association shall: (1) own, manage, and provide Upkeep for Cluster Common Area; (2) promote the peace, comfort, safety, and general welfare of the Owners and Occupants of the Cluster; (3) represent its Members as a group in matters related to the Association; and (4) collect and disburse the Cluster Assessments and charges authorized by this Article and the Cluster Documents governing such Cluster.

(c) **Membership.** Members shall include all Owners of Lots within the Cluster, and may include such other Members as are provided in the Cluster Documents. The voting rights of members shall be as defined in the Cluster Documents.

(d) **Board of Directors.** Each Cluster Association, as appropriate, shall elect a board of directors (the "Cluster Board") consistent with its Cluster Documents.

(1) Composition. The number and manner of election of the directors and officers shall be as provided in the Cluster Documents.

(2) Extent of Power. The Cluster Board shall have all powers needed to carry out the purposes of the Cluster Association which are enabled by law or this Article and which are not specifically reserved to the members, including the right to:

(a) permit payment of the annual Assessment in installments and to declare the entire balance of such Assessment immediately due and payable upon default in the payment of any such installment;

(b) charge a late fee on a delinquent Cluster Assessment and charge interest on delinquent Assessments and charges;

(c) assess the costs, including attorney's fees and court costs, of collecting delinquent Assessments and charges and of enforcing Cluster Association rules;

(d) provide exterior maintenance on any portion of all residential units, accessory structures, or Lots in the Cluster, if, after Notice, pursuant to Deed Section I.1(bb)(2), such maintenance is approved by at least a two-thirds vote of the Category A Members of the Cluster; and

(e) represent the Cluster Association and its Members in matters related to the DRB, Covenants Committee, or Board of Directors, each of which shall give due consideration to the advice of the Cluster Board.

**Section VII.2. Cluster Common Area.**

(a) **Conveyance.** Title to a Cluster Common Area shall be conveyed to the Cluster Association, free and clear of financial encumbrances, prior to conveyance of the first Lot in a Cluster to an Owner who is not the builder. In the event the Cluster is developed in phases, the Cluster Common Area in each phase shall be conveyed prior to conveyance of the first Lot in that phase. Improvements to the Cluster Common Area, shown on a final development or site plan of a Cluster or phase thereof, as approved by the DRB, need not be made at the time of conveyance of such Cluster Common Area but shall be completed by the builder prior to or upon substantial completion of the Cluster or Cluster phase, as the case may be.

(b) **Right of Enjoyment.** Every Cluster Member shall have the right of enjoyment of the Cluster Common Area, and may delegate such right to members of his family, tenants, or guests, subject to this Deed and the following:

(1) the right of the Cluster Board, after Notice, pursuant to Deed Section I.1(bb)(2), and hearing, to establish reasonable rules of use, including parking rules. Such rules shall be published where they are reasonably available to a majority of members of the Cluster Association;

(2) the right of the Cluster Board to establish reasonable charges for the use of carports, parking, storage, or other facilities on Cluster Common Area;

(3) the right of the Cluster Board to exchange Cluster Common Area with the Association, provided such area shall remain open space, as defined by the Fairfax County Zoning Ordinance, and subject to the requirements of Deed Section IV.3, and approval by a majority vote of the Category A Members within the Cluster, entitled to vote; and

---

(4) the right of the Cluster Board to grant easements or right of access over the Cluster Common Area.

(c) **Upkeep of Cluster Common Area.**  Any Cluster Association shall keep the Cluster Common Area or the common elements, as applicable, in good order, condition, and repair and in a clean and sanitary condition (in keeping with the general character of the Property) including without limitation all necessary grounds Upkeep.

(1) If such Cluster Association fails to keep the portion of the Property for which such Cluster Association has Upkeep responsibility in good repair and condition and in a neat and orderly condition, consistent with the Design Guidelines and Use and Maintenance Standards, then the Covenants Committee may, pursuant to resolution, give Notice, pursuant to Deed Section I.1(bb)(2), to that Cluster Association of the condition complained of, specifying generally the action to be taken to rectify the condition.

(2) If the Cluster Association fails to take the action specified by the Covenants Committee to rectify the condition within thirty days after the date of the Notice, pursuant to Deed Section I.1(bb)(2), is given, or such other period as may be specified in the Notice if the circumstances warrant a different period, the Covenants Committee shall have the right (but not the obligation) pursuant to Deed Sections VI.2(c) and (d) and any resolutions adopted by the Board of Directors, to rectify the condition by taking such action (or by causing such action to be taken) as was specified in the Notice.  Pursuant to Deed Section V.9, the costs incurred shall be charged against such Cluster Association.

**Section VII.3. Cluster Assessments.**

(a) **Purpose and Amount.** Cluster Assessments shall be in an amount appropriate to and used exclusively to carry out the purposes of the Cluster Association, to establish reserves for repair and replacement of Cluster property, and to improve Cluster Common Area, and other property and improvements owned or leased by the Cluster Association. The provisions of Deed Section V.1. shall apply to Cluster Assessments.

(b) **Lien.** Cluster Assessments and charges authorized in this Article shall be a continuing lien upon the Lot against which each such Assessment is made. Except as provided in Deed Section VII.5, the provisions of Deed Sections V.2, V.3, and V.4 shall apply to the lien of Cluster Assessments.

(c) **Annual Assessment.** Each Cluster Board annually shall fix the Assessment against each Lot on a fair and equitable basis, and the date or dates such Assessment shall come due. If the Cluster Board fails to fix the amount of the Assessment prior to the beginning of any fiscal year, the amount of the previous year's Assessment shall apply to the new year.

(d) **Special Assessment.** A Cluster Board may levy at any time a Special Assessment against some or all of the Lots in the Cluster, applicable to not more than ten years, for the purpose of defraying in whole or in part, the cost of any acquisition or construction, reconstruction, repair, or replacement of a capital improvement upon the Cluster Common Area or other property, including

fixtures and personal property thereon, provided such Assessment is approved by a majority vote of the affected Category A Members in the Cluster.

**Section VII.4. Party Walls.**

(a) **General Rules of Law.** Each wall or fence that is built on the dividing line between two or more Lots shall constitute a party wall. To the extent not inconsistent with the provisions of this Section, the general rules of law regarding party walls and liability for real or personal property damage due to negligence or willful acts or omissions shall apply thereto.

(b) **Rights of Owners.** Owners of contiguous Lots who have a party wall or party fence shall equally have the right to use such wall or fence, provided that such use by one Owner does not interfere with the use and enjoyment of same by the other Owners. Each Owner shall have an easement of ingress and egress over that portion of the Property necessary for the repair and maintenance of the party wall or fence. There shall be no impairment of the structural integrity of any party wall or fence without the prior consent of all affected Owners.

(c) **Damage or Destruction.** In the event that any party wall or fence is damaged or destroyed (including deterioration from ordinary wear and tear or lapse of time), it shall be the obligation of all Owners whose Lots adjoin such wall or fence to restore it promptly at their equal expense and they shall be liable to the Association jointly and severally for the costs of restoration if the Association makes the repairs.

(d) **Arbitration.** In the event of any dispute concerning a party wall or fence, each Owner shall choose one arbitrator, who jointly shall choose an additional arbitrator, and their decision with respect to the dispute shall be by a majority and shall be binding upon the Owners.

**Section VII.5. Developer Licenses.** Perpetual exclusive licenses, including the privilege of ingress and egress, for the use and occupancy of parking spaces, garages, and storage areas on the Cluster Common Area within certain Clusters have been assigned by a developer to certain Lots within the Cluster. Unless the license provides otherwise, such license shall pass with the title to the Lot to which it is assigned and may be leased by the Owner to other Owners or Occupants within the Cluster for successive terms of one year or less. The Cluster Association shall be responsible for the maintenance, repair and replacement of such areas and may assess such costs against the benefited Lots.

**Section VII.6. Indemnification and Insurance.**

(a) **Indemnification.**

(1) Each Cluster Association shall indemnify, defend, and hold the Association and its Members, employees, and agents, harmless from and against all suits, causes of action, losses, costs, damages, fines, expenses, contracts, attorneys' fees, prosecutions, judgments, liabilities, and claims of any nature arising out of or caused by any acts, errors, omissions, or negligence of the Cluster Association or its employees, agents, and contractors in connection with the Upkeep of the real estate owned or maintained by the Cluster Association.

(2) The Association shall indemnify, defend, and hold each Cluster Association and its Members, employees, and agents, harmless from and against all suits, causes of action, losses, costs, damages, fines, expenses, contracts, attorneys' fees, prosecutions, judgments, liabilities, and claims of any nature arising out of or caused by any acts, errors, omissions, or negligence of the Association or its employees, agents, and contractors.

(b) **Insurance.** Each Cluster Association shall obtain and maintain, for such Cluster Association's benefit and at such Cluster Association's expense, policies of insurance written by reputable companies licensed or qualified to do business in the Commonwealth of Virginia providing at least commercial general liability insurance (including without limitation bodily injury and property damage liability insurance) in a minimum amount of one million dollars for each occurrence and two million dollars in the aggregate, or such other higher amounts as the Cluster Association deems appropriate. Each Cluster Association shall provide a certificate of insurance signed by an agent of the insurer to the Association Board of Directors at least fifteen days prior to the expiration of such insurance and notify the Association Board of Directors of all renewals thereof on an annual basis, unless otherwise determined by the Association Board of Directors. Each Cluster Association shall also notify the Association Board of Directors of any material modifications, lapses, or termination of such policies. The Association shall be named as an Additional Named Insured as its interests may appear. Any policy obtained shall provide that it may not be cancelled except upon thirty days written notice to the Association. The Association and the Association Board of Directors shall not be held liable for the failure of any Cluster Association to purchase insurance.

**Section VII.7. Disclosure Packet.** The Cluster Association shall provide a Disclosure Packet, as required, accordance with the procedures and fees set forth in the POAA, as may be amended.

## Article VIII Duration and Amendments

**Section VIII.1. Duration.** The protective covenants and restrictions contained in this Deed shall continue in full force and effect until January 1, 2026, and shall then be continued automatically for successive periods of twenty years each, unless prior to the expiration of any such date or period, a revocation or vacation of this Deed is executed and acknowledged by the Members who represent more than fifty percent of the Category A and B votes and filed of record. In the event the protective covenants and restrictions of this Deed are revoked or vacated and the Category A and B Members determine to dissolve the Association in accordance with law, the Common Area shall not be disposed of, by sale or otherwise, except to an organization with similar purposes, without first offering to dedicate the same to Fairfax County or other appropriate governmental agency.

**Section VIII.2. Amendment to Provisions of This Deed.**

(a) **Member Approval.** Except as otherwise expressly provided in Deed Sections VI.2(b)(15) and VIII.2(b) or throughout this Deed, in addition to corrective amendments made pursuant to Deed Section VIII.2(f), and subject to Deed Section VIII.2(c), Material Amendments to this Deed (not including a Supplementary Declaration) shall require the prior approval of the Board of Directors and more than a two-thirds vote of the Category A and B Members in a referendum in which at least thirty percent of such Members participate.

(b) **Category Approval.** An amendment to Deed Sections III.4(b)(2), III.5(a), insofar as it pertains to the Category B Members, to Deed Section V.8(a)(1), and/or to this Deed Section VIII.2(b) shall require: (1) the prior approval of the Board of Directors and a majority vote, by voting power, of the Category B Members; and (2) approval by more than a two-thirds vote of the Category A Members in a referendum in which at least thirty percent of such of such Members participate.

(c) **Prerequisites to Amendment.** Written Notice, pursuant to Deed Section I.1(bb)(2), of any proposed amendment to this Deed or any Supplementary Declaration by the Association shall be provided to every Owner (or every Owner of a Lot subject to such Supplementary Declaration) at least fifteen days before any action is taken. No amendment shall increase the financial obligations of an Owner in a discriminatory manner or further restrict development on existing Lots in a discriminatory manner. No amendment may modify this Article or the rights of any Member hereunder without obtaining the approvals required by Deed Sections VIII.2(a) and (b).

(d) **Supplementary Declarations.** Amendment of a Supplementary Declaration is governed by the provisions for amendment contained therein and the requirements of Deed Section VIII.2(b). A Supplementary Declaration may not be amended to reduce any maximum annual Limited Common Expense Assessment set forth therein. Except as otherwise provided in this Deed, a Supplementary Declaration may not include provisions inconsistent with this Deed. Although this Deed and the Supplementary Declaration should be construed to give effect to both, in the case of conflicting provisions, this Deed shall control.

(e) **Material Amendments.** A material amendment to the Reston Documents includes any amendment adding, deleting or amending any provisions regarding: (1) Assessment or liens, pursuant to Article V; (2) any method of imposing or determining any charges to be levied against Owners; (3) reserves for Upkeep of the Common Area; (4) Upkeep obligations; (5) allocation of rights to use the Common Area; (6) any scheme of regulation or enforcement of standards for Upkeep, architectural design, or exterior appearance of improvements; (7) reduction of insurance requirements; (8) restoration or repair of the Common Area or Lots; (9) the addition, annexation or withdrawal of real estate to or from the Property; (10) voting rights; and (11) restrictions affecting lease or sale of a Lot.

(f) **Corrective Amendments.** The President may unilaterally sign and record a corrective amendment or supplement to the Deed to correct a mathematical mistake, an inconsistency, or a scrivener's error, or clarify an ambiguity in the Deed with respect to an objectively verifiable fact (including without limitation recalculating the liability for Assessments or the number of votes in the Association appertaining to a Lot) upon a vote of two-thirds of the Board of Directors.

38

(g) **Effective Date of Amendments.** An amendment shall become effective when a deed setting forth such amendment, executed and acknowledged by the President and Secretary of the Association, and containing a certification that the amendment procedures set forth herein have been complied with, shall have been recorded among the land records of Fairfax County or on such later date as may be specified in the deed of amendment.

(h) **Action to Challenge Amendments.** Any action to challenge the validity of an amendment adopted by the Association may not be brought more than one year after the amendment is effective. In no event shall a change of conditions or circumstances operate to amend any provisions in this Deed.

# Article IX General Provisions

## Section IX.1. Enforcement.

(a) The Association, any Cluster Association, any Condominium Association, or housing cooperative within the Property, and any Owner shall have the right to enforce all provisions in this Deed by any proceeding at law or in equity.

(b) The Association shall have the right to record among the land records of Fairfax County a notice of violation of any provision of this Deed and to charge the offending owner the cost of recording and removing such notice in accordance with Deed Section V.10.

(c) Failure to enforce any provision of this Deed shall in no event be deemed a waiver of the right to do so thereafter, nor shall any liability attach to the Association or any other person or organization for failure to enforce such provision.

**Section IX.2. Severability.** The determination by any court that any provision of this Deed is unenforceable, invalid, or void shall not affect the enforceability or validity of any of the other provisions.

**Section IX.3. Interpretation.** This Deed shall be liberally construed in favor of the party seeking to enforce the provisions hereof to effectuate the purpose of protecting and enhancing the value, marketability, and desirability of the Property. The Board of Directors shall have the right to interpret all provisions of the Reston Documents, except Deed Section VI. 1.

**Section IX.4. Conflict.** In the event of conflict among the Reston Documents, this Deed shall control, then the Articles of Incorporation, and then the Bylaws.

**Section IX.5. Use of New Technology.** Due to the ongoing development of new technologies and corresponding changes in business practices, to the extent permitted by law now or in the future: (i) any Notice required to be sent or received; (ii) any signature, vote, consent, or approval required to be obtained; or (iii) any payment required to be made, under the Reston Documents may be accomplished using the most advanced technology available at that time if such use is a generally

accepted business practice. This Section shall govern the use of technology in implementing the provisions of this Deed dealing with notices, payments, signatures, votes, consents, or approvals.

(a) **Electronic Means.** To the extent permitted by law, the Association and its Members may perform any obligation or exercise any right by use of any technological means providing sufficient security, reliability, identification, and verifiability. Acceptable technological means shall include without limitation electronic communication over the internet, the community, or other network, whether by direct connection, intranet, telecopier, or e-mail.

(b) **Signature Requirements.** A digital signature meeting the requirements of applicable law shall satisfy any requirement for a signature under the Reston Documents.

(c) **Electronic Funds Transfer.** Payment of all sums to and from the Association and the Members may be made by electronic transfer of funds creating a record evidencing the transaction for the period such record would be required to be available in non-electronic form.

(d) **Voting Rights.** Voting and approval of any matter under the Reston Documents may be accomplished by electronic means provided that a record is created as evidence thereof and maintained as long as such record would be required to be maintained in non-electronic form.

(e) **Non-technology Alternatives.** If any Member or third party does not have the capability or desire to conduct business using electronic or other technological means, the Association shall make reasonable accommodation, at its expense, for such person to conduct business with the Association without use of such electronic or other means until such means has become generally (if not universally) accepted in the Washington, D.C. area.

**Section IX.6. Effect on Prior Deeds of Dedication.** This Deed is intended to amend and restate in all respects the Deed of Amendment to the Deeds of Dedication of Reston, Deed Book 6072 at page 69, as amended, and shall apply to all the Property from and after the effective date, except that:

(a) Any delinquent Assessments in favor of the Association or any Cluster Association which became due prior to the effective date of this Deed, shall continue as a lien against the Lot in question and as the personal liability of the Owner, as provided under the Deed of Amendment to the Deeds of Dedication of Reston, but the collection thereof shall be governed by the provisions of this Deed;

(b) Any use of the Property which is actually being carried on as of the effective date of this Deed, and which is permissible under the Deed of Amendment to the Deeds of Dedication of Reston shall continue to be permitted for so long as it is carried on continuously by the same person on the same Lot or other portion of the Property, even if such use would not otherwise be permissible under the terms of this Deed; and

(c) The decisions of the DRB prior to the effective date of this Deed shall continue in full force and effect, and the DRB, the Association and all affected owners shall be bound thereby. The enforcement of any decision shall be governed by the provisions of this Deed.

**Section IX.7. Effective Date.** This Deed of Amendment shall become effective upon its recordation in the land records of Fairfax County, and further, this amendment shall not have the effect of shortening the term of any incumbent Director.

## X. Affected Property

The real property upon which such amendments are intended to be operative shall be each and every Lot or other parcel of the Property which is now subjected to the provisions of the Deed of Amendment to the Deeds of Dedication of Reston.

IN WITNESS WHEREOF, the Reston Association has caused this First Amendment to the Deed of Amendment to the Deeds of Dedication of Reston to be executed by its duly authorized officers the day and year first above written.

RESTON ASSOCIATION

BY: _____
Jennifer Blackwell
President

ATTEST: _____

Mark Watts
Secretary

COMMONWEALTH OF VIRGINIA
COUNTY OF FAIRFAX, to-wit:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, whose commission expires on the 26 day of APRIL ,2006 do hereby certify that Jennifer Blackwell, President of RESTON ASSOCIATION, whose name is signed to the foregoing document, bearing date on the 26 day of April, 2006, this day acknowledged the same before me in my jurisdiction afore said.

_____
Notary Public

COMMONWEALTH OF VIRGINIA
COUNTY OF FAIRFAX, to-wit:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, whose commission expires on the _26_ day of _April_ ,20_06_ do hereby certify that Mark Watts, Secretary of RESTON ASSOCIATION, whose name is signed to the foregoing document, bearing date on the _26_ day of April, 2006, this day acknowledged the same before me in my jurisdiction afore said.

_Catherine Susan Juhs_
Notary Public

BK 18419 1268

## CERTIFICATION

I, the undersigned, do hereby certify:

I am the duly elected and acting Secretary of the Reston Association , a Virginia nonstock corporation located in Fairfax County, Virginia, established pursuant to those certain Deeds of Dedication of RESTON, Sections One and Two, recorded among the land records of Fairfax County, Virginia, in Deed Book 2431, page 319, et seq, and Deed Book 2499, page 339, et seq, as subsequently amended.

That the above referenced First Amendment to Deed of Amendment to the Deeds of Dedication of Reston was duly adopted in accordance with the amendment procedures set forth in Article VIII, Section VIII.2 of the Deed of Amendment to the Deeds of Dedication of Reston, recorded among the land records of Fairfax County, Virginia, in Deed Book 6072, page 0069, et seq..

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of the Reston Association this 26 day of April, 2006.

_____
Secretary

COMMONWEALTH OF VIRGINIA
COUNTY OF FAIRFAX, to-wit:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, whose commission expires on the 26 day of _____ ,2006 do hereby certify that Mark Watts, Secretary of RESTON ASSOCIATION, whose name is signed to the foregoing Certification, bearing date on the 26 day of April, 2006, this day acknowledged the same before me in my jurisdiction afore said.

_____
Notary Public

4 3

05/02/2006
RECORDED FAIRFAX CO VA
TESTE:
CLERK